**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN**

**BUILDER'S WORLD, INC.,**

        **Plaintiff,**

v.                                                                               **Case No. 06-C-555**

**MARVIN LUMBER & CEDAR, INC.,[1]**

        **Defendant.**

## DECISION AND ORDER

### I. PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff Builder's World, Inc., ("BWI"), a Wisconsin cooperative ("co-op"), i.e., a non-profit member corporation, which distributes windows manufactured by defendant Marvin Lumber & Cedar, Inc., ("Marvin"), a Minnesota corporation, brought this action in state court alleging that Marvin violated the Wisconsin Fair Dealership Law ("WFDL"), Wis. Stat. § 135.01 et seq., by substantially changing the competitive circumstances of the parties' dealership agreement without good cause. Marvin removed the case based on diversity of citizenship.[2]

Pursuant to an agreement with Marvin, BWI distributes Marvin windows in a territory located primarily in Eastern Wisconsin. BWI shares the territory with another distributor, S&S. Although in some parts of the Midwest, Marvin sells windows directly to dealers ("dealer-direct"), it did not do so in BWI's territory. Rather, Marvin relied on a two-step distribution system, which involved its selling to distributors, i.e., BWI and S&S, who in turn sold to dealers

---

[1] I previously consolidated the present case with a suit against Marvin brought by S&S Sales, Inc. ("S&S"), case number 06C0354. However, that case settled, and I have amended the caption accordingly.

[2] For diversity purposes, BWI is a Wisconsin citizen. See CCC Info. Servs., Inc. v. Am. Salvage Pool Assn., 230 F.3d 342, 345-347 (7th Cir. 2000).

who in turn made retail sales.

In 2006, Marvin changed the distribution system that it employed in BWI's territory. While it did not terminate BWI or S&S as distributors, it began to sell dealer-direct. Marvin states that it did so because several of its large dealers expressed interest in buying directly from it and because it believed that if it did not sell dealer-direct, it would lose market share. This change precipitated the present suit. BWI sought a preliminary injunction barring Marvin from selling dealer-direct in its territory. On November 28, 2006, I denied BWI's request, holding that it had not established that it would suffer irreparable harm as a result of the change. I entered a scheduling order and set a trial date of October 15, 2007. BWI now renews its motion for a preliminary injunction, contending that since November it has suffered severe harm and that in the absence of preliminary relief, it will suffer irreparable harm. I heard oral argument and now address BWI's request.

Marvin and BWI commenced their relationship in 1964. In that year, they entered into an oral agreement pursuant to which BWI distributed Marvin windows in a territory consisting roughly of Eastern Wisconsin. On a number of occasions thereafter, the parties modified and extended the agreement. In about 1978, BWI took over from Marvin the task of providing service to its customers. In about 1988, BWI became a full service distributor, which required it to provide to dealers such services as training, architectural drafting, warranty work and ordering. These duties required BWI to hire additional staff. Further, as a full service distributor, BWI could not distribute other manufacturers' windows. In the 1990s, Marvin authorized BWI to distribute additional brands of Marvin windows and expanded BWI's territory.

As a co-op, BWI is owned by about fifty member/customers ("members"), some of which are relatively large Marvin dealers. Other BWI members are small. BWI purchases windows from Marvin and distributes them to its members and to some non-member customers. Both

2

BWI's member and non-member customers then make retail sales. BWI retains only a small portion of its profits, distributing the remainder to its members in the form of patronage dividends. BWI has a board of directors, which establishes policy, and it is operated by a management company, Shuter & Company ("Shuter"), whom it pays about $1 million a year. BWI operates out of a building owned by Shuter and leases equipment and vehicles from Shuter. Shuter employs about fifteen people who work on BWI business.

BWI carries an extensive inventory of parts for Marvin products and a wide assortment of support products. It prominently displays Marvin logos on the property and equipment that it leases, and it maintains a website featuring Marvin products. BWI's representatives also regularly attend trade shows where they promote Marvin windows. BWI and its members spend about $100,000 per year advertising and promoting Marvin products. BWI generates about $15 million of revenue annually, about seventy-five percent of which comes from the sale of Marvin products. A like percentage of BWI's profits is derived from the sale of Marvin products.

BWI has a line of credit of $2.2 million, the purpose of which is to pay for its purchases of windows from Marvin. BWI's ability to draw on the line of credit is tied to its gross sales. BWI states that since November 2006, as a result of Marvin's selling dealer-direct, it has lost eight of its largest members and about sixty percent of its gross sales. These members appear to have left BWI in order to purchase windows directly from Marvin and because they believed that BWI was a sinking ship. One member stated:

> As we proceeded through the year of 2006, I became increasingly concerned with the issues that were developing between Marvin Windows and Builder's World.
>
> Also troubling was the fact that our buying partner [ ], was inquiring about purchasing the products direct from Marvin. [Our company] would have struggled to meet the minimums imposed to attain truckload pricing if [our buying partner]

3

is [no] longer purchasing from Builder's World.

(Third Supplemental Shuter Decl. Ex. A.)

BWI presents financial documents that indicate that it stands to suffer losses of between $200,00 and $435,000 by the end of 2007. BWI states that before incurring such losses, its board would liquidate the co-op. BWI presents a certified public accountant's audit of its current financial condition, which agrees with BWI's bleak assessment of its prospects for survival and opines that "[t]he resulting loss of sales and gross profits raises substantial doubt about the company's ability to continue as a going concern." (Third Supplemental Shuter Decl. Ex. F.) BWI also indicates that in the absence of a preliminary injunction, it foresees considerable difficulty in financing the present litigation through trial.

I will state additional facts in the course of the decision.

## II. PRELIMINARY INJUNCTION STANDARD

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (citations omitted). Granting a preliminary injunction involves the "exercise of a very far-reaching power" and is "never to be indulged in except in a case clearly demanding it." Roland Mach. Co. v. Dresser Indus. Inc., 749 F.2d 380, 389 (7th Cir. 1984) (citations omitted).

A party seeking a preliminary injunction must demonstrate that it has some likelihood of success on the merits, that there is no adequate remedy at law, and that it will suffer irreparable harm if the injunction is not granted. AM Gen. Corp. v. DaimlerChrysler Corp., 311 F.3d 796, 803 (7th Cir. 2002); see also Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 895 (7th Cir. 2001). If the party satisfies this burden, the court must consider "the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the

4

irreparable harm the moving party will suffer if relief is denied," and consider the public interest. Ty, Inc., 237 F.3d at 895. The court's goal is to minimize the consequences of either denying a preliminary injunction to a party who will go on to win the case on the merits or of granting an injunction to a party who will go on to lose. Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd., 780 F.2d 589, 593-94 (7th Cir. 1986).

### III. LIKELIHOOD OF SUCCESS ON THE MERITS

Generally speaking, a plaintiff can establish that it is likely to succeed on the merits if it can show that its chances of prevailing are better than negligible. Omega Satellite Prods. v. City of Indianapolis, 694 F.2d 119, 123 (7th Cir. 1982). However, the degree to which a plaintiff must establish that it is likely to prevail varies inversely with the degree of injury that the plaintiff will suffer absent an injunction. Id. In a WFDL case, a party seeking a preliminary injunction must establish that it is likely that it is the grantee of a dealership as defined by the WFDL and that the grantor substantially changed the competitive circumstances of the dealership agreement without good cause. Wis. Stat. § 135.03. BWI contends that Marvin granted it a dealership and that it substantially changed the competitive circumstances of the dealership agreement without good cause by selling dealer-direct in BWI's territory.

Marvin responds that BWI is unlikely to succeed on the merits for a number of reasons. First, it contends that it did not grant BWI a dealership. This is so, according to Marvin, because (1) its agreement with BWI predates and thus is not subject to the WFDL; (2) as a co-op, BWI is not a dealer within the WFDL; and (3) it and BWI lack a community of interest, which under the WFDL is a prerequisite for a dealership. Second, Marvin contends that it did not substantially change the competitive circumstances of the parties' agreement. This is so, according to Marvin, because BWI did not have an exclusive right to distribute Marvin products in its territory. Finally, Marvin argues that even if it substantially changed the competitive

5

circumstances of the agreement by selling dealer-direct, it had good cause to do so, i.e., the need to respond to a changing marketplace. I address each of Marvin's contentions in turn.

**A.     Existence of Dealership**

**1.     Relevant Dates**

The Wisconsin legislature enacted the WFDL in 1974 and made it applicable to dealerships entered into after April 5, 1974. Subsequently, the legislature amended the WFDL and effective November 24, 1977, made it applicable to all dealership agreements "including any renewals or amendments." § 135.025(2)(d). In <u>Wipperfurth v. U-Haul Co.</u>, 101 Wis. 2d 586, 588 (1981), the Wisconsin Supreme Court held that applying the WFDL to a pre-WFDL agreement would violate the contract clause of the United States Constitution. The agreement between Marvin and BWI commenced in 1964. However, as discussed, the parties modified and extended the agreement on several occasions subsequent to November 24, 1977. Thus, under <u>Wipperfurth</u>, the agreement is subject to the WFDL if the parties' post-1977 modifications/extensions to it are renewals or amendments within § 135.025(2)(d).[3]

I conclude that the parties' post-1977 modifications/extensions of the 1964 agreement, collectively and in the case of the 1988 modification extension, individually, constitute both amendments and renewals within § 135.025(2)(d) and bring the agreement within the coverage of the WFDL. The parties' modifications to the agreement constitute amendments because they substantially changed the agreement at a time when both parties knew that such changes would bring the agreement within the WFDL and because there is no evidence in the record suggesting that either party anticipated the changes when they first entered into the agreement. <u>See</u> Michael A. Bowen & Brian E. Butler, <u>The Wisconsin Fair Dealership Law</u> § 5.8 (3d ed.

---

[3]If they are, I see no constitutional impediment to finding the agreement subject to the WFDL.

6

2006) (stating that to bring a pre-WFDL agreement within the statute, an amendment "apparently requires a change in the parties' relationship that is substantial and that the parties did not anticipate when they entered into the original agreement").

The modifications/extensions also constitute renewals within the WFDL because they extended the agreement, again at a time when both parties knew that such extensions would bring the agreement within the WFDL. A number of courts have found that post-1977 extensions of agreements bring the agreements within the WFDL. See, e.g., Reinders Bros. v. Rain Bird E. Sales Corp., 627 F.2d 44, 49 (7th Cir. 1980); Kealey Pharmacy & Home Care Srv. Inc. v. Walgreen Co., 539 F. Supp. 1357, 1363 (1982), aff'd, 761 F.2d 345 (7th Cir. 1985); Paul Reilly Co. v. Dynaforce Corp., 449 F. Supp. 1033, 1035 (E.D. Wis. 1978).

In support of my conclusion that the post-1977 modifications/extensions both substantially changed and extended the parties' agreement, I note the following: When BWI commenced distributing Marvin's products, it had one outside salesperson and provided no services to customers. In 1978, at Marvin's suggestion, BWI began to provide services to customers, and it hired a warranty service technician to do so. In 1988, the parties modified the agreement in a substantial way. At Marvin's request, BWI became a full-service distributor. This required BWI to take on additional service responsibilities as well as the duties of ordering materials and performing architectural drafting and warranty work. To fulfill such responsibilities, BWI had to take on additional staff. Further as a full-service distributor, BWI could not distribute product lines that competed with Marvin products. Subsequent to 1988, the parties made additional modifications/extensions to the agreement. Marvin authorized BWI to distribute additional Marvin product lines and to distribute in a larger territory. The parties made these modifications/extensions with full knowledge of the WFDL and its provision that renewals or amendments to a pre-WFDL agreement would bring the agreement within the

WFDL. Thus, the parties' post-1977 modifications/extensions to the agreement brought it within the statute.

**2.      Effect of BWI's Being a Co-op**

Marvin also argues that the agreement is not subject to the WFDL because BWI is a co-op. However, nothing in the text or legislative history of the WFDL suggests that the legislature intended to preclude co-ops from being dealers. The WFDL defines a dealer as "a person who is a grantee of a dealership." § 135.02(2). The statute defines a "person" as a "corporation or other entity." § 135.025(6). Under Wis. Stat. § 185.02, a co-op is "an association incorporated" in the state. Thus a co-op is a corporation or other entity within § 135.025(6) and subject to the WFDL.

Marvin also argues that Shuter is promoting the lawsuit for its own purposes and that the suit does not serve the interests of all of the members of the co-op. However, BWI has standing to bring this action, and it would be improper for me to pierce its corporate veil. See Wabash Valley Power Ass'n v. Rural Electrification Admin., 903 F.2d 445, 453 (7th Cir. 1990). Further, BWI's board of directors approved the suit. BWI acknowledges that Marvin's decision to sell dealer-direct affects its members differently and generally creates significant problems for its smaller dealers who rely more heavily on staff to provide service to their customers.

**3.      Community of Interest**

Marvin does not dispute that it entered into an agreement with BWI but argues that the agreement is not within the WFDL because the parties lack a community of interest. In determining whether parties to an agreement share a community of interest, Wisconsin courts have established two primary guideposts: (1) whether the parties share a continuing financial interest in the sale of goods or services, and (2) whether the parties are interdependent such that a termination of the agreement by the alleged grantor would threaten the financial health

8

of the alleged dealer. Home Protective Servs., Inc. v. ADT Sec. Servs., Inc., 438 F.3d 716, 719 (7th Cir. 2006). In the present case, the parties clearly share a continuing financial interest in the sale of Marvin windows. As to interdependence, the Wisconsin Supreme Court has developed a multi-factor test, which the Seventh Circuit has distilled into two critical inquiries: (1) the percentage of revenues and profits that the alleged dealer derives from the products of the alleged grantor, and (2) the amount of time and money the alleged dealer has sunk into the relationship. Id. at 720. The ultimate question is whether the alleged grantor has the alleged dealer "over a barrel" – that is, whether the alleged grantor's economic power over the alleged dealer is such that the latter will be unable to meaningfully negotiate or comparison-shop. Id.

I conclude that BWI is likely to be able to establish that Marvin had it over a barrel and that therefore the parties shared a community of interest. BWI derives approximately seventy-five percent of its revenues and a like percentage of its profits from distributing Marvin windows. Further, BWI has sunk a great deal of time and money into the relationship. BWI has distributed Marvin windows for over forty years and is precluded from distributing other companies' windows. Further, over the years, BWI has invested many millions of dollars in developing its business as a Marvin distributor. BWI presently invests about $1 million per year in managing the business, plus an additional $100,00 to $200,000 in advertising, equipment and the like. Further, the evidence strongly suggests that BWI has insufficient economic power to negotiate the dealer-direct issue with Marvin or to find a replacement for Marvin. In addition, as I will discuss in greater detail, the evidence indicates that Marvin's decision to sell dealer-direct has created a serious threat to BWI's ability to survive financially. As mentioned, since Marvin commenced selling dealer-direct, BWI has lost eight major customers and sixty percent of its annual gross revenue. Thus, BWI is likely to be able to show that it and Marvin share a community of interest and are parties to a dealership agreement.

## B. Substantial Change

I turn now to whether BWI is likely to be able to show that Marvin substantially changed the competitive circumstances of their agreement. Under § 135.02(3)(a), the terms of a dealership agreement may be express or "implied." BWI argues that based on the parties' conduct, it will be able to show that Marvin impliedly agreed not to sell dealer-direct. Marvin disputes that it is likely that BWI will be able to demonstrate that it made such a commitment inasmuch as BWI does not have an exclusive right to distribute Marvin windows in its territory.

I conclude that BWI is likely to be able to show that Marvin impliedly agreed not to sell dealer-direct in its territory. I reach this conclusion for several reasons. First, it appears that between 1964 and 2006, Marvin never sold dealer-direct in BWI's territory and that Marvin knew that BWI's investment of time and money in building its business was predicated on its belief that Marvin would not do so. Further, the issue of Marvin's selling dealer-direct arose between the parties in 1997 and 1999, and the manner in which it played out supports the inference that Marvin agreed not to sell dealer-direct in BWI's territory. In 1997, Marvin apparently made several sales to dealers in BWI's territory, to which BWI objected. The parties negotiated a settlement of the dispute, one of the terms of which appears to have been that Marvin would not sell dealer-direct in BWI's territory. In 1999, Marvin apparently sold windows to several lumberyards in BWI's territory, and BWI objected. Marvin denied making such sales but also represented to BWI that it had no intention of expanding the territory in which it sold dealer-direct.

I also conclude that BWI is likely to be able to show that by selling dealer-direct, Marvin effected a substantial change in the competitive circumstances of the parties' agreement. This is so because in competing with BWI to distribute windows, Marvin, as a manufacturer, has a considerable advantage. For one thing, it is likely to be able to offer dealers a more attractive

10

price. Further, the fact that since Marvin decided to sell dealer-direct it has successfully solicited a number of BWI's members, resulting in BWI's loss of a substantial amount of revenue, indicates that the change Marvin made was a substantial one.

Finally, the fact that BWI shares distributorship rights in its territory with S&S does not undermine the notion that Marvin impliedly agreed not to sell dealer-direct in BWI's territory or that its decision to do so effected a substantial change. BWI has amicably shared distribution rights with S&S in its territory since 1988. Moreover, it is one thing for BWI to compete with a distributor of roughly comparable power in the marketplace and quite another to have to compete with the manufacturer of the product that it is attempting to distribute. See, e.g., Anchor Real Estate Servs. v. Coldwell Banker Residential Affiliates, Inc., Case No. 87-C-945-S (W.D. Wis. Sep. 7, 1988).

## C. Good Cause

Marvin further contends that even if selling dealer-direct substantially changed the competitive circumstances of its agreement with BWI, BWI is unlikely to succeed on the merits because it had good cause to sell dealer-direct, namely, a change in the nature of the business of selling windows. In Ziegler Co. v. Rexnord, Inc., 147 Wis. 2d 308, 314 (1988), the Wisconsin Supreme Court held that a grantor's own economic circumstances could constitute good cause for reasonable, essential, and nondiscriminatory changes in the way it did business with dealers. Interpreting Ziegler, the Seventh Circuit held in Morley-Murphy Co. v. Zenith Electronics Corp., 142 F.3d 373, 377 (7th Cir. 1998), that to show good cause for making a substantial change in the competitive circumstances of a dealership agreement, it is not enough for a grantor to show that it could make more money as the result of the change. Rather, the grantor must demonstrate "(1) an objectively ascertainable need for change, (2) a proportionate response to that need, and (3) a nondiscriminatory action." Id. at 378. Applying

11

these criteria to the evidence in the record, I conclude that the evidence is unlikely to show that Marvin had good cause to make such a substantial change in the parties' relationship.

As justification for selling dealer-direct, Marvin states that some of its competitors have eliminated the two-step distribution system and now sell directly to dealers. It also states that several of its larger dealers asked if they could buy directly from it and that if it did not agree, such dealers would likely have turned to one of its competitors. However, Marvin presents no evidence that any Marvin dealers presented such ultimatums or that, if they did, whether their threats were credible and, if so, what financial effect their defections might have had. Marvin presents no evidence that by not selling dealer-direct, it would have been likely to lose money in BWI's territory. On the contrary, it appears that in recent years, Marvin has experienced record sales and record profits and that it has made money in BWI's territory. Thus, it is unlikely that the evidence will show that Marvin had an objectively ascertainable need to change its distribution system in BWI's territory and even if it does, that selling dealer-direct was a proportionate response to it. Moreover, because it appears that Marvin has not gone dealer-direct everywhere but in fact maintains a two-step distribution system in some areas, the evidence may well also show that Marvin's action was discriminatory.

**D.     Conclusion as to Likelihood of Success**

For the reasons discussed above, I conclude that BWI has a more than negligible chance of prevailing on the merits of its WFDL claim.

### IV. NO ADEQUATE REMEDY AT LAW/IRREPARABLE HARM

A plaintiff seeking a preliminary injunction must also show that it has no adequate remedy at law and that it will suffer irreparable harm if the injunction is not granted. <u>Roland Mach. Co.</u>, 749 F.2d at 386. The absence of an adequate remedy at law is a precondition to any type of equitable relief. The requirement of irreparable harm is needed to take care of the

situation where the plaintiff is seeking equitable relief, thus implying that it has no adequate remedy at law, but can easily wait until the end of the trial to obtain such relief. Id. A plaintiff can obtain a preliminary injunction only if it will suffer irreparable harm in the period prior to trial – that is harm that cannot be prevented or fully rectified by the final judgment after trial. Id.; see also Rio Grande Cmty Health Ctr., Inc. v. Rullen, 397 F.3d 56, 76 (1st Cir. 2005) (stating that irreparable injury in the preliminary injunction context means an injury that cannot be compensated either by a later-issued permanent injunction or a later-issued award of damages). A plaintiff will suffer such harm if it (1) becomes insolvent or loses its business; (2) is unable to finance the lawsuit; (3) incurs damages that are very difficult to calculate; or (4) if the defendant becomes insolvent or loses its business. Roland Mach. Co., 749 F.2d at 386.

BWI argues that it is likely to suffer irreparable harm between now and the trial because it is likely to become insolvent or nearly insolvent and/or because it will probably be unable to finance the costs of the litigation. Marvin disputes BWI's contention that it is likely to suffer irreparable harm and further contends that even if BWI does suffer such arm, its decision to sell dealer-direct is not the cause of the harm. Marvin also argues that BWI could take a number of steps to minimize the harm, such as drawing on its line of credit, getting members of the co-op to come up with funds to keep it afloat and reducing overhead. Finally, Marvin argues that even if I grant preliminary relief, those BWI customers who have defected to Marvin may not return. Because I conclude that it is likely that BWI will become insolvent and/or be unable to finance the lawsuit through the completion of trial proceedings and because I find Marvin's contentions unpersuasive, I conclude that BWI is likely to suffer irreparable harm between now and the completion of trial proceedings.

Although there is no hard and fast definition of insolvency, Webster's Third New International Dictionary 1170 (3d ed. 1986) defines it as being "unable or having ceased to pay

13

debts as they fall due in the usual course of business; having liabilities in excess of the reasonable value of assets held." And the Supreme Court has stated that when a person "is unable to pay his debts, he is understood to be insolvent. It is difficult to give a more accurate definition of insolvency." Cunningham v. Norton, 125 U.S. 77, 90 (1888). A parsing of the cases granting and denying preliminary injunctive relief to business plaintiffs based on business losses makes clear that losses resulting from competition will not establish irreparable harm if they are sustainable. See, e.g., Jack Kahn Music Co., v. Baldwin Piano & Organ Co., 604 F.2d 755, 764 (2d Cir. 1979); Fox Valley Harvestore, Inc. v. A.O. Smith Harvestore Prods., Inc., 545 F.2d 1096, 1097 (7th Cir. 1976). Rather, a business plaintiff must show that its losses are likely to be sufficiently staggering that it may well be unable to pay its bills and operating expenses. See, e.g., Performance Unlimited, Inc. v. Questar Publishers, Inc., 52 F.3d 1373, 1380 (6th Cir. 1995) (finding likelihood of insolvency where evidence indicated that plaintiff would probably be unable to operate its business if it did not receive royalties constituting sixty percent of its revenue); see also Tri-State Generation & Transmission Ass'n v. Shoshone River Power Inc., 805 F.2d 351, 356 (10th Cir. 1986) (concluding that a co-op would likely become insolvent as the result of the departure of one member because such departure was likely to lead to departure of other members and to the co-op's going out of business prior to trial); Beilowitz v. Gen. Motors Corp., 233 F. Supp. 2d 631, 645 (D.N.J. 2002) (finding likelihood of insolvency where plaintiff would suffer forty percent loss of revenue and probably be unable to cover payroll and operating expenses).

  BWI presents evidence that since November 2006, eight of its top-purchasing members, which account for almost sixty percent of gross sales, have departed, finding it economically advantageous to purchase from Marvin. BWI also presents financial documents indicating that it stands to lose between $200,000 and $435,000 in 2007 with the exact amount depending

14

on such variables as the attorneys fees that it incurs in the present lawsuit and the losses that it suffers from future defections of members. As previously noted, BWI retains virtually no income. In support of its projections, BWI submits an audit conducted by a certified public accountant, which expresses "substantial doubt about the company's ability to continue as a going concern." (Third Supplemental Shuter Decl. at F.)

Thus, it appears likely that BWI will suffer serious losses in the coming months such that it will go in the red and be unable to meet its obligations, including its obligation to pay its lawyers to pursue the present suit. Moreover, BWI states that if insolvency loomed, its board would likely liquidate the co-op.

Marvin contends that even if BWI is likely to suffer irreparable harm, the cause of such harm will not be its decision to sell dealer-direct but rather internal disagreements within the co-op, namely that some of BWI's larger members would prefer to purchase windows directly from Marvin rather than from the co-op. As previously indicated, Marvin's decision to sell dealer-direct has impacted different BWI members differently. Nevertheless, Marvin's argument is unpersuasive because it ignores both that its decision to sell dealer-direct is the cause or one of the principal causes of any intra-co-op disagreements and because whether or not individual members of the co-op might prefer to buy from Marvin, BWI has established that it is likely to prevail on its claim that by selling dealer-direct, Marvin violated the WFDL. If Marvin's decision to sell dealer-direct was a violation of the WFDL and such decision is likely to cause irreparable harm to BWI as a co-op, it is irrelevant for purposes of granting a preliminary injunction that some BWI members benefit from the change.

Marvin's suggestions that BWI can likely manage its anticipated shortfall are unconvincing. BWI is not required to overleverage itself. Thus, it need not attempt to draw on a line of credit, the purpose of which is to enable BWI to purchase windows, in order to pay

15

its attorneys. Nor must BWI's members come up with their own funds. As indicated, a number of its larger members have defected, and it is unlikely that its smaller members have sufficient resources to keep BWI afloat. Nor is BWI obligated to make further cuts in its overhead. BWI states that Shuter has already laid off at least five employees and made significant cuts in costs, and that further reductions would likely undermine its ability to provide the services required by its distributorship agreement with Marvin. I also find Marvin's contention that an injunction would not benefit BWI unpersuasive. If Marvin cannot sell dealer-direct pending the trial, at least some of its recently acquired customers are likely to return to BWI.

For the foregoing reasons, I conclude that BWI has established that in the absence of preliminary relief, it is likely to suffer irreparable harm between now and the completion of trial proceedings.

## V. HARM TO MARVIN/PUBLIC INTEREST

In considering BWI's request for preliminary relief, I must also consider whether granting the injunction might cause Marvin to suffer irreparable harm and whether it would affect the public interest. I conclude that granting BWI a preliminary injunction would not irreparably harm Marvin. BWI has and would likely continue to aggressively promote Marvin's products. Cf. Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies Ltd., 970 F.2d 273, 275-76 (7th Cir. 1992) (stating that a grantor would likely suffer if a preliminary injunction required it to continue to do business with a serial violator of the dealership agreement). Further, not selling dealer-direct in BWI's territory between now and the trial is likely to have a very modest effect on Marvin's overall financial status.

As to the public interest, I conclude that it does not weigh heavily in either party's favor.

## VI. SECURITY

Fed. R. Civ. P. 65(c) requires that I condition the grant of an injunction upon the posting

16

of security. The purpose of requiring the party obtaining an injunction to post security is to compensate the enjoined party, if it prevails on the merits, for the pecuniary harm caused by a preliminary injunction. Ty, Inc. v. Publisher's Int'l Ltd., 292 F.3d 512, 516 (7th Cir. 2002); see also Cronin v. U.S. Dep't of Agric., 919 F.2d 439, 446 (7th Cir. 1990) (noting that an injunction bond compensates for the pecuniary harm caused by an injunction). Because the damages caused by an erroneous preliminary injunction cannot exceed the amount of the bond posted as security, and because an error in setting the bond too high is not serious, district courts should err on the high side when setting bond. Mead Johnson & Co. v. Abbott Labs., 201 F.3d 883, 888 (7th Cir. 2000). However, a district court cannot simply set the bond at whatever high number it thinks appropriate; instead, reasons must support the number chosen so that a reviewing court can determine whether such number "was within the range of options from which one could expect a reasonable trial judge to select." Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis, 35 F.3d 1134,1141-42 (7th Cir. 1994) (internal quotation marks and citation omitted).

In the present case, neither party has presented evidence on the issue of the appropriate amount of a bond. Thus, I have no basis for making even an educated guess with respect to that issue. Therefore, in order to comply with the requirement to set a bond, I will require BWI to post a nominal bond of $1,000. However, I direct the parties to submit information to me so that I am able to set a bond in an appropriate amount.

### VII. CONCLUSION

For the reasons stated,

**IT IS ORDERED** that BWI's motion for preliminary injunction is **GRANTED.** Marvin is hereby **ENJOINED** from selling dealer-direct in BWI's territory between now and the completion of the trial in this matter, provided that BWI gives give security by depositing with the Clerk the

17

sum of $1,000 in a cashiers check or other certified funds within seven days of the date of this order. Failure to provide the requisite security will cause this order to lapse of its own accord. If BWI provides the requisite security, this preliminary injunction shall remain in effect until further order of the court.

Dated at Milwaukee, Wisconsin this 3 day of April, 2007.

/s_____
LYNN ADELMAN
District Judge